313-0685, the people of the state of Illinois, athlete by Laura DeMichael v. Joseph Messina, appellant by Sebastian Stinson. Mr. Stinson, good afternoon. Good afternoon, your honor. May it please the court, counsel. This case is potentially more than just an appeal of a person who is sentenced for probation for aggravated battery. I pray that it doesn't happen, but if the victim were to pass away prematurely and he gets 24-hour care, the state could bear a host of additional charges. I recognize that's not before this court, but if they charge him with murder, that's 25 years non-probationary. That's what's hanging over my client, and that's why it's so important to him that due process was afforded in this case. I'd like to begin my comments about the loss of the photograph. This is a case that arises out of an incident that happened outside a bar in Burkina, and after 14 witnesses testified, Detective Salen, unknown to the defense, testified that he had taken a photo of the defendant's hand in the booking room. What's unique about this, and I looked at case law not only in Illinois, but in the entire country, and there is not a reported decision where the police department took a photograph of the instrumentality of the battery, didn't tell anybody they took the photo, destroyed it and didn't tell anybody, and it didn't come out until the middle of trial that this photo was created and destroyed. This is one first impression. What's also kind of interesting is that this is a weapon whose condition changes over time, meaning that the condition of the hand, the photo, is very important at the time it was taken. Again, this is in the charging document, the hand. It's the instrumentality of the offense. The other interesting fact about the photo, or what makes this unique, is you learn mid-trial that the police may have not been truthful about its destruction. We learn in the middle of the trial that the officer is giving multiple versions as to whether it was created and destroyed. That's learned in the middle of the trial. Most of the cases in Illinois, destruction of evidence is something you learn pre-trial. There's a motion to dismiss, or if it does come out in the middle of the trial, you just learn that it's something that they didn't turn over. What's unique about this is they are learning bias or impeachment evidence in the middle of the trial. The first issue, I think, that needs to be resolved is whether the photo effect was created. And what we have is, first, the officer's initial testimony that he took this photo. And he was very specific. He goes, I believe it was the right hand. Very specific recollection. We then have something which I would submit is there's nothing stronger than the booking room video. At 2.34 and 47 seconds on the booking room video, which is in evidence, you can see the officer lean over and take a photo of his hand. Third, the court made a finding, I would submit, that the photograph existed. In a ruling, she says, you can see him leaning over and taking the photo. Fourth, the court proceeded then, on ruling on the motion for a new trial, to analyze the prejudice, the prejudice to the defendant. Now, if the photo was never taken, there would be no reason to evaluate any prejudice. It wasn't like she was saying, well, we don't know, but in any event, there's no prejudice. She was evaluating what the prejudice to the defendant was. And that does not happen unless the photo existed. The photo was obviously destroyed because it wasn't present. And then one of the questions is whether or not there was bad faith by the police in destroying it. First, we have the officer that gives three different versions. Again, when he first got on the stand, he says, I took the photo. I believe it was the right hand. He then is told to come back a week later to see if he can find it. He comes back, and he testifies after being prepared by the state. He gets on the stand. They ask him, did you take the photo? And he says, I don't know. That's version number two. About a half hour later in the same hearing, the judge asks a question. Did you take this photo? And his third version is, no, I did not take the photo. So we have, I took the photo. I don't know if I took the photo, to I did not take the photo. And what's interesting is the judge, as I said earlier, ultimately found that the photo was taken. And his last testimony, his last version, was I did not take that photo. That is bad faith in my opinion. I would also posit this. What's the probability that the officer would have a specific recollection that he took the photo, and what hand it was, and then you go and look at the booking room photo, and it just so happens that it corroborates his recollection? What's the probability of that happening? What's the probability that of all the photos that the state created, and they created probably 50 photos from the scene. They took three photos of the clothing. Of the 50 photos that they took, the one photo that they lost or destroyed happened to be the one that was most favorable to the defendant. There's also a time gap in the video. There's 15 seconds right around this time of him taking this photo that skips, and that has never been explained. So what was the actual ruling that the judge did? Well, there's three types of analysis that goes into whether there's a due process violation. Under gun blood, if it's material and exculpatory, that is a due process violation. That's one. Two, if it's potentially useful and you can show bad faith, that is also a due process violation. And then third, under Brady, if it's a discovery violation, that also is a violation of due process. I would submit, and I think the evidence was clear, that this photo was material. It was exculpatory. It showed no injury. It's something that the defense would love to have blown up and shown to a jury and argued to the jury to use their experiences and their knowledge. Would somebody that got punched so hard that knocked them out and then punched them a second time, would you have some injury on that hand? That was never afforded to the defendant to make that argument. So what did the judge actually rule? It's only two pages, her ruling, and there's nothing about her doing any type of analysis. There's nothing where she looks at whether it's material, exculpatory, potentially useful, bad faith. Zero analysis. I understand that you can assume that she knows the law, but in her ruling she said nothing. All she said was, I am going to use this evidence to evaluate Detective Salen's credibility. I don't know how that solved the problem because Detective Salen didn't do anything. He was a booking room officer. He did nothing in this investigation. How is determining that Detective Salen is not a credible person solve any of the prejudice to the defendant? The other thing that she was going to do was that she was going to allow the defendant to argue that the state has no evidence of injury to the hand. And what she did wrong on this was the defendant argued for a mistrial. The state came back and argued for what's kind of known in the civil context as a 501 instruction. It's an adverse influence instruction, but it's also given in criminal cases where if one party loses an object, a piece of evidence, you can infer that that piece of evidence would be exculpatory. It would be favorable. That's what the state recommended. That's not what she did. She did not say, I am finding that this photo would have been helpful or exculpatory. All she did was say, I'm going to let you argue that they didn't present any evidence. So I would submit that she didn't even, she essentially did nothing in terms of mitigating the prejudice to the defendant. With regard to the prejudice, and in the brief we give a bunch of reasons why this was prejudicial, but again, it's important to note that there's two aspects here of what's being prejudicial. It's not only the loss of the photo, but it's, again, it's finding out the inconsistent statements. It's finding out that the officers might have bias, might be impeachable. And at that point, there was 14 witnesses. Already six officers had already testified. We couldn't go back and cross-examination through re-questioning those officers about the bias of the department. That wasn't an option. The other important thing, and again, in terms of what was prejudicial, you're talking about changing witness selection, changing cross-examination, possibly retaining an expert to look at the photo, cross-examining the ER doctor that was on the day before about what he thought would be in the photo and talk about the injuries and whether or not hand injury would result from the severity of the blow. None of that was available. What I'd like to point to, though, is the jury waiver issue. When Messina did his jury waiver, and the case law states that it must be based on an informed decision, he was aware of non-refusance by the police department or negligence. He was aware that when the officers stopped the van, they didn't search the van to find the real culprit inside. He was aware that they didn't show Galini, the person who really ARPAN committed this. None of the witnesses were shown his booking room photo. There's a lot of things that they did that they could have done. But in the middle of the trial, Messina learns the department engaged in possibly malfeasance or misconduct. And with regard to that prejudice, how was Messina given the opportunity to argue to the jury that the police engaged in malfeasance? You cannot make this argument to a judge in a bench trial. I was a prosecutor for eight years, and if I was a judge, I don't know a criminal defense attorney that would take a bench trial and argue police misconduct to me. And I consider myself to be an unbiased person. But I worked with police officers for eight years while they were my friends. How was Messina given the opportunity to make that argument to a jury that they engaged in malfeasance when they destroyed this photo? The trial court in this case, she was a former prosecutor. We listed a couple of examples in the brief where she showed some bias about the loss of the photograph. Where she was chastising defense counsel for suggesting that the officer did change his testimony. In fact, I think she told him that he better watch what he says when he was simply pointing out that he had changed his version of what happened. Again, Messina was never given the option to make those arguments to his peers. With my time remaining, I'd like to briefly discuss the elements of the failure of the state to prove the elements of aggravated battery. And I acknowledge that it's a very heavy burden. But again, the standard is whether or not the identification testimony cannot be based on doubtful, vague, or unreliable evidence. And I'm going to give an unusual analogy here. I apologize. But I think it shows why this was a bad identification. What happened here was it was 1 a.m. It's raining out. It's dark. It's chaotic in front of this bar. There's about 10 to 15 people standing outside this bar. Two sober witnesses are sitting in the car who made the ultimate identification that it was him. The alleged battery happens, and the witnesses testify that one group of people in which the defendant was with run into a waiting white van that's sitting at the curb. So they all see them going to the van. Immediately, within a minute, the police show up, open the door, grab the first person that's hiding in the van, throw him on the ground, handcuff him, pick him up, and say, is this the guy? Now, all of us have seen, gone to a magic show where there's a magician who goes into a box, comes out five seconds later wearing similar clothing, and then a minute later they show him standing up in the rafters. And you realize that the person that went into the box and came out wearing similar clothing was not the same person. But it's human nature for us to want to think that it's the same person. So what happened is they all rush into the car, and they pull out this guy who's a similar build, white male, same age, and they throw him on the ground, and they say, is this the guy? What they don't realize is Galini, the person who ultimately came in and took the Fifth Amendment in this case, is hiding in the last seat of the van. And they don't search the van, they let the van go. What happens, the two eyewitnesses come back to the station and they interview him, and they say, yeah, the guy you got is the right guy, even though we didn't search or we didn't know if there was anybody in there. And what's interesting is they describe that the offender, one said khaki shorts, and the other one said he was wearing beige shorts. And the defendant was wearing long blue jeans. Now this isn't a minor clothing article, this isn't what his socks were. These two witnesses who apparently saw this whole thing, one is saying he's wearing khaki shorts, and the other one says he's wearing beige shorts, and he's wearing long blue jeans. What's the statistical probability that two witnesses who don't consult with each other, don't compare notes, go back to the station and say that this person who committed this offense was wearing khaki shorts? And the memory can't be based on when the defendant was sitting there on the curb, handcuffed in his long blue jeans. That's not where the memory is coming from. The memory is coming from the person that actually did this, the woman. Mr. Simpson, is there any similarity in the physique of the defendant and the other man, Mr. Blolini? I think their photos are part of the record. I believe they're both muscular white males, if that helps. But I think the photos of both of them are in the record for you to make your own determination. The other interesting thing is, there's three eyewitnesses who they take back who are friends of the defendant, who they ask, you know, did you see who did this, and they can't identify anybody. But one of the interesting ones is Dahlman, who's a friend of the defendant. Anthony Manette, one of the witnesses, said that the defendant was standing in front of him when the punch was thrown. So they identified him as being arguing with the victim. Dahlman says that the person who threw the punch came in from the left and threw the punch, which would be interesting because this was a sucker punch. The reason why this guy didn't see this coming was he was arguing and didn't see this sucker punch from this Blolini person that came in and threw the punch. What's interesting is Dahlman, although he's identifying this other person that came in, was never shown, he was shown a photo lineup that had the defendant, could identify it. He was never shown Blolini. So what did the police department know at that point? Well, they started to suspect that Golini maybe did this, even though they have all this evidence at this time that they say it was the defendant. So they asked all the witnesses, what was Golini wearing? What shorts? Why are they asking them about shorts? Do they think Golini did it? So they go to Golini's house and they try to speak to him, and his dad won't let him come to the door. So they can't talk to him. He's the only person that did not talk to the police. They can't look at his hands. One of the investigators interviews Plarski, one of the witnesses, and starts asking him about Golini. And when he's talking about Golini, he's referring to him as the murderer. You know, why are you protecting the murderer? Something like that. The difference is the police actually start to realize, oh my God, you've got somebody who's got different shorts. You've got all these problems. They are starting to think maybe they have the wrong person. So I would submit based on, and again, I recognize the high burden that you have in terms of attacking an identification witness, but this was a highly suggestive show-off. To take somebody and throw them on the ground, pick them up, handcuff them, with all the other problems that I've indicated, I would submit that the conviction should be vacated or, in the alternative, a new trial should be granted. Ms. DeMichel, good afternoon. Good afternoon. May it please the Court, Counsel, Laura DeMichel on behalf of the people. I'll respond to the reasonable doubt issue first. Defendant was proven guilty beyond reasonable doubt. The evidence was sufficient to do so. The standard of review is really important here. It's kind of been glossed over by defendant's argument. Defendant has tried to re-argue the evidence, and he's taken every inference possible in favor of the defendant and argued it as if those were the facts that we need to consider. When actually under the Collins standard, the evidence is to be viewed in the light most favorable to the people, and the question is whether viewing the evidence in that way, any rational trier of fact could find the evidence sufficient. Under the appropriate standard, defendant was certainly proven guilty beyond reasonable doubt on the evidence presented. The witnesses, the problems with the witness testimony or eyewitness identifications were not severe like defendant stated. There have to be five bad identifications. It's not just one witness. There's five of them. About the rain, the witnesses testified it was raining on and off that night, but it wasn't raining heavily at the time of the offense, so the rain didn't interfere with their abilities to observe. The lighting was described by one witness as amply lit. There were lamps, I think, both sides of the doorway and under the canopy, and the witnesses all said their views weren't obstructed and they were a couple feet to 15 feet away when they observed the defendant. About the van and whether the van had more people in it, two witnesses testified that there was only one person in the van and they could have seen if there were other people in the van, but there weren't any. Then we have the person, because I know there was testimony about somebody that was driving the van that they called so-and-so, bring the van around because there's this fight going on. I think they were, so there must have been the driver of the van, but in the back there was only the one person crouched between the seats, is how I understood the testimony to be. As far as the officer stated, he could have seen if there was a third person hiding in that back of van area, and I believe the driver may have been pulling up the van before it was even in progress, but no one identified the driver as the one who threw the punch. He was getting in the car at that time. This is a conversion van? It sounded to me, I know the middle row of seats was one seat and then another seat, and it seemed like there's a possible bench seat in the back, but the witnesses, so the bouncer who hadn't been drinking at all that night, he saw a defendant get in the van and only defendant get in the van as the door was going to close. He was there, and he opened it right back up and said, you know, you need to stay here. The police have already been called, and he maintained visual contact with the defendant from that point until the police came. Then he said, hey, the guy who did it isn't here. So he identified him to the police after never losing sight of him after he saw him throw the second punch. Now, he didn't see the first punch thrown because he was inside, but he did see the second one and identified defendant as the one who threw it and then tracked him the whole way. So he didn't say a whole bunch of people got in the van. He only saw the one person in the van, and the van wasn't set up that it could have been hiding this mystery. So there was, like, no cargo area? Well, I know the officer testified that if there was other people in the van, he could have seen it. So I'm not sure the exact setup besides those middle row seats other than the testimony was if there was other people in there, he would have seen it. Yeah. All vans that I know of have the area behind. Like a trunk? Right, but in a van, it's not a trunk. It's a cargo area because you can go from the back seat into the cargo area. And there is, unless maybe somebody was standing up, but the seats obstruct. If you look, put your head in, you'll see the back seat. You don't see the suitcases or things that go in the back. I mean, that's just not possible. Unless the person was standing up, you might be able to see them. Well, Cisco tracked Defendant as the one that ran into the van and opened it and said Defendant was the one in there. And whether there was another person in the van or not, Defendant was certainly in the van, and Defendant was identified by three eyewitnesses as the one who threw the punches. But the van door closed, right? So Cisco, I think he said as it was closing, he opened it back up. So I don't think it closed all the way when he opened it back up. But regardless of whether there was four people in the van or just Defendant, Defendant is still identified by Siegert, he's identified by Kowalsik, he's identified by Cisco as the individual who threw the punches. So no one else in the van, if there was anyone else, which the testimony from the state's witnesses suggested there was not, no one else in that van is identified by these witnesses as throwing the punches. While Defendant's witnesses eventually say this Glealmie person was the one that did it, one of his witnesses said that Defendant has a different hair color than Glealmie, and all five of the witnesses, Siegert, Kowalsik, Cisco, Tony, and Anna Minetti, all said that the one who threw the punches had dark hair, or the one who was arguing with the victim had dark hair. At least two of them said he had clothes on that he didn't have on. About the shirts, yes, but about the T-shirt, they all agreed that he was wearing a white shirt with black graphics. No one said that this Glealmie person was wearing... Did someone say he had a collared shirt on? I think he said he had a white collared shirt with black graphics, but he still, these inconsistencies were for the trial judge to resolve. In general, their descriptions overwhelmingly matched of a six-foot-tall person with dark hair, who Glealmie did not have dark hair, wearing a white shirt with black graphics. Glealmie sure was never described as having graphics. Plus, Anna Minetti stated that... She saw a picture of Glealmie, and she said he wasn't even there at the time. So, in the light... Given the evidence in the light and most favorable of the people, would mean finding these witnesses who described the defendant as the offender credible, given... Mr. Glealmie was not present. I guess that leads me to another issue that I have in terms of... that we are supposed to take with a high standard of review. Then, did the judge not inquire enough about the Fifth Amendment privilege? Well, defense counsel was the one who said he had it. Defense counsel was the one who represented that a sufficient inquiry had been done. Defense counsel never called him and tried to ask specific questions. He just said, I think he would have to say he did it, and he said that I believe that given that you talked to his attorney, and given that here's the questions I would ask, and here's how I think he would answer, that that's sufficient to answer your inquiry. So, he represented that the inquiry was sufficient, and he's the one who proposed that he have this Fifth Amendment right in the first place. There are cases that don't require the judge to personally question the individual taking the Fifth Amendment right. In one of the cases I cited, the judge only interacted with the witness's attorney, and in the other, only interacted with the defense counsel. So, the personal questioning wasn't required. And this was all at defendant's, it's how defendant viewed matters. So, he's now taken an inconsistent position on appeal, which is not permitted. If he wasn't there, why would he take the Fifth Amendment? Well, right. Well, defense counsel represented that he was there, and he was the offender. So, obviously there's a split in the testimony, but that's why under defense counsel's desired version of events, then he said he had one. So, he could have still theoretically been accountable, if he had given some kind of assistance under the people's version, which is all these witnesses agreed that defendant was the one who threw the punch, but he never talked to police or anybody, so they didn't know exactly what he was going to say either. Defendant's witnesses were impeached. The Raymond individual claimed that Guglielmi did it, and yet he never said this until three years after the events. His friend, who was like his brother, defendant, he let him sit in jail for two months, apparently just thinking Guglielmi was going to do the right thing, he says, but that doesn't make any sense. It doesn't make any sense that he says he told defendant's parents that Guglielmi did it, and yet the parents didn't react in such a way that would cause him to tell anybody about it for three years. Then he said he didn't tell anybody about it until his sister got in some kind of accident, and that event caused him to think, okay, now I need to do the right thing, but he didn't even tell defense counsel until a year later. How could it be impeachment if the judge has granted him the right to take the Fifth Amendment based on he could be prosecuted if he gives testimony in this case? I mean, I don't know how your witness, the defense witness, you can say that he's... Guglielmi was allowed to take the Fifth, but Raymond is the one who said Guglielmi did it. But you're saying that none of that makes sense. If none of that makes sense, then being granted the Fifth Amendment, not to testify, refusing to testify, does not make sense. Right, which is why this is an error encouraged by defendant, or else Guglielmi would plan to perjure himself to protect his friend. And he knew that the state had all these eyewitnesses who had an identified defendant, so being perjured himself, he couldn't be charged with this because the state still knew that the one that punched him was Messina. Although, again, there could have been some kind of accountability theory where one was the actual puncher, but the other one encouraged it. We don't know what Guglielmi said, but defense counsel is the one that urged this version of events. So the people saying that he was impeached is in no way inconsistent with what we believed below, which was that he either wasn't there or he didn't throw the punches. The people weren't the ones saying, yeah, he's the one that threw the punches, that was defense counsel. Defense counsel is the one that wanted him to take the Fifth. Defense counsel is the one that said, here's the inquiry you need to do. It's good enough. Let him take the Fifth. Paver also described Guglielmi as having worn jeans. So if khaki shorts is all that matters, then the theory that it must have been Guglielmi because he was wearing khaki shorts doesn't stand up on the state of the evidence either because Guglielmi, who had different color hair, was also described as wearing jeans. Also the khakis weren't all that important because Kowalski said maybe he was wearing khaki shorts. He said he didn't really remember. He said the thing he remembered was the most distinctive item of clothing, which was the white shirt with the black graphics on it. And shorts or not, he was 99% certain that the person who threw the punches was the same one that was apprehended by police and that there had been some distance, three or four feet, of the other people from defendant at the time he threw the first punch and only defendant was standing over him at the time of the second punch. So any inconsistencies were for the trial judge to resolve. The inconsistencies weren't so great that they destroy the entire case, especially in light of the weaknesses with defense witnesses and the fact that everyone described the person who punched the victim as having dark hair and defendants on witness described him as having different color hair. About the photo issue, again the standard of review here is an abuse of discretion, whether the trial judge abused her discretion in failing to grant his mistrial with prejudice as he desired. And the people are going to disagree on the facts here. The people made two alternative arguments. First said the photo never existed and second it didn't matter whether it existed or not because there was just no conflict as to whether the hand was injured or not. Everyone agreed the hand wasn't injured. So prejudice can be analyzed first because it's outcome determinative. It doesn't matter whether it existed or not, although the people still maintain that it didn't exist because if there's no prejudice there's no need for any sanction. The evidence was not material exculpatory evidence because it was merely cumulative. Defendant's own motion for mistrial recognized that other evidence covered the same point. Everything reached the conclusion that the hand was undamaged. Before Siegert even took the stand, two different witnesses said that the hand was not damaged and defense counsel had tried to question them about would you have taken a picture, would you have put it in your report? When you went to police school, didn't you learn certain things are important? Wouldn't you have looked at the hands? That's all before anything about the hand photo even came up. There's just no conflict in the evidence about whether the hand was damaged so there's no need for anything to cure prejudice because the judge found there wasn't any prejudice. An adverse inference instruction isn't needed because there's no evidence that needs to be countered. Everyone agreed the hand was not damaged. Also the people don't agree that the judge found the evidence had been destroyed rather than just not recorded by the camera or just lost. She said a photo did not exist but she didn't say it had been intentionally destroyed or had ever existed. The comment about the photo being taken but it doesn't exist was made in the context of talking about how the people did not have to go back and recheck a memory card. She said technology is great but it doesn't exist which could be talking about maybe he tried to take it, he thought he took it, he didn't take it. Carlson got the camera a few hours later, he took off all of the photos from the camera that Seelan had used. There was only three, there was no hand photo. So if there's bad faith why would he take a photo just a deleted minutes later? If there's bad faith why would he try to hide this hand photo and then at trial say oh yeah there's this hand photo. If there's bad faith and it's a cover up why would the two other officers say oh no there's nothing wrong with the hand. Instead it's just this occurred three years after the booking process, the trial was three years later, it makes more sense that it was misremembered or maybe he pressed the button halfway instead of all the way, thought he got it and didn't. He said he wouldn't check the card and it certainly wasn't there when Carlson got it. There's also no prejudice for being able to blow up a hand photo because there's still no hand photo. So whether this would come up before trial or not, you can't get any expert witness to identify a hand photo or blow up a hand photo because it still doesn't exist. The fact that it came out that he thought maybe he took one doesn't make it exist. Also the jury waiver cases are different because both of them involved braiding material whereas here the testimony covered this issue. And there wasn't police misconduct, there was negligence at best. The judge never found police misconduct so you still can't argue police misconduct where it just appears, if anything, negligence in failing to use the camera right or somehow failing to print the picture. So also the trial judge didn't show bias. Her comment was based on defense counsel referring to the officer as an adverse witness, even though he hadn't shown bias and he was answering all of defense counsel's questions and he was answering them all in a non-hostile manner. So if there's no further questions, the people would ask that this court affirm defendant's conviction and sentence. Thank you, Ms. DeMichel. Mr. Simpson, rebuttal. Just briefly, Your Honors, with regard to whether or not there were people in the van, in our footnote and our reply, we point to page 392 of the record in which Kowalczyk, which is their witness, said that he saw four to six people go into the van. That's their witness. So there were people in this van. I don't know why saying that the officer said he didn't see anybody makes any sense, but all the defense witnesses said there were four to six people and even a state witness said that. With regard to whether or not this is cumulative evidence, there's no evidence in the record that prior to trial, the defendants knew that there was no injury to the hand. There's nothing in the record that I could find where that was ever disclosed. That was found out in the middle of the trial. Also, they seem to suggest that all testimony about the hand is somehow cumulative of being able to go in front of a jury and blow up a digital photo. So these are digital. These are things you can blow up. These are things you can show a doctor, you can show an ER doctor, a medical examiner and ask. These officers are not medical personnel. They can't look at a hand and say whether or not there's inflammation or cuts or whatever. To suggest that the officer saying I don't see any injuries is not the same as having that photograph. Again, trial strategy would be different. Witness selection would be different. The six officers that went earlier would be different. There's nothing cumulative about being able to argue police bias or misconduct. And again, I get back to the jury trial. Their only response is, well, the two cases you cite are Brady cases. I still have not heard them explain why or how he made an informed decision when he waived jury. Had he known this, would he have made a different decision? Would he have said, you know what, I want my peers, I want 12 people to look at Detective Salen and look at that booking room photo and see whether or not these guys were out to get him. He never had that opportunity. They seem to suggest it might be a technical glitch. That's why there wasn't a photo. The first time I heard about that was in the appeal because there's nothing in the record. They never argued that. I suggest anything is possible, but we have a booking room photo that shows this happened. And it's so important to note that the officer believed he took the photo. That's what he first said. It just so happens, again, that this evidence is favorable. I would submit there was no technical glitch and the court found that it was taken, found that it was destroyed. This is a very strange case on multiple levels. Some of the issues we haven't even got into. We have the state's attorney right after he's found guilty sending an ex parte email to the trial judge then reporting himself to the ARDC. How many times do you have a state's attorney self-reporting himself? We have photos of the instrumentality of the offense being created and destroyed and you find out in the middle of the trial. You have somebody that comes in and takes the Fifth Amendment, refuses to testify. I don't understand their accountability theory. I can't think of how he could possibly be held accountable. But he comes in and takes the Fifth Amendment, three people identify him as the person, yet they're saying that he had nothing to do with it so he should have never taken the Fifth. You have two eyewitnesses who come forward and say the two main witnesses and identify a key piece of evidence, the clothing, and it's different. Finally, we have the trial judge herself. I've read a lot of her opinions and she's very careful about what she says on the record. When she finds somebody guilty, she doesn't give any findings of fact. She's very conscientious about what she says. On the motion for the new trial in this case, she said she struggled with her decision. She struggled. I'm overjoyed that she said that because I always love judges that show that they're thinking about questions, but it also acknowledges that she realizes how much serious error occurred in this case. You cannot struggle with a decision unless there was something that was seriously of error. The last thing that I'll leave you with, I would submit that if Detective Salmon was the first witness, he was on day three, if he was the first witness and this came out, I don't think anybody would say that she would not have just said, all right, mistrial, let's start this again. I don't think that due process should be predicated about whether or not it's convenient to have to go back and do three days' worth of trials. Certainly Mr. Messina deserved to have due process. He deserved to have the opportunity to change his trial strategy, to change his questioning, to impeach, to maybe come up with these different theories. He was never afforded that, and given what's at stake here, given the fact that this could be affirmed and then ten years from now they decide to charge him with murder, this is vitally important that he was afforded due process. And given the identification testimony, which is so questionable, given what happened with the photo, I would respectfully ask that this court vacate or the alternative grant him the trial. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in recess until 9 o'clock tomorrow morning.